## PEOPLE v. BIGGINS.*

### No. 10,859; May 15, 1884.

#### 3 Pac. 853.

**Information.**—Where a Demurrer to an Information is Overruled, and a Plea of not Guilty is entered, the court may set aside the order overruling such demurrer, and allow counsel for the people to confess the demurrer, and file a new information, and such order will be equivalent to an allowance of the demurrer.

**Information.**—An Information is Sufficient, on Demurrer, Which Complies Substantially with the provisions of the statute.

**Homicide—Killing After He is Helpless.**—Where, by the evidence, it was shown that deceased while drunk had assaulted defendant, who thereupon knocked him down, and, while lying helpless on the ground, jumped with both feet on his face, from which act death ensued, held, that the killing was unlawful and felonious; that there were none of the elements of involuntary manslaughter in such act; and that the charge of the court to that effect was correct.

---

*Reversed in bank. See 65 Cal. 565, 4 Pac. 570.

Criminal Trial.—Where, at the Request of a Party, Certain Instructions are Given, he cannot thereafter complain of them.

Criminal Trial.—Instructions to a Jury Should be Given With Reference to the Imminent Facts in the case. If controverted, instructions upon them should be hypothetical, leaving the supposed facts which the evidence tends to prove to the consideration of the jury. If uncontroverted, the court may assume them.

Trial.—Where the Charge to the Jury, Considered as a Whole, Correctly States the law, and no portion of it is calculated to mislead the jury, the verdict should not be disturbed, although some part of the charge, standing alone, may contain some inaccuracy of expression which would be the subject of criticism.

APPEAL from the Superior Court of Fresno County.

W. D. Tupper for appellant; Attorney General Marshall for respondent.

McKEE, J.—On August 28, 1882, an information was filed in the superior court of Fresno county against Patrick Biggins, charging him with having committed the crime of murder. Upon demurrer it was held to be defective, and, by direction of the court, a new information was filed, to which a demurrer was interposed, which was overruled, and the defendant then entered a plea of not guilty; but upon the day fixed for trial, counsel for the people moved the court to set aside the order overruling the demurrer to the information and allow him to confess the same. The court granted the motion, and entered an order setting aside the overruling of the demurrer, and thereupon, as was recited in the order, counsel for the people confessed the demurrer, and the court directed another information to be filed. Upon the filing of the third information the defendant, after a demurrer to it had been overruled, entered two pleas—one not guilty and the other a former acquittal. Upon these he was tried and convicted of murder of the second degree.

In the course of the preliminary proceedings it was objected, and on appeal it is now objected: First, that after a plea of not guilty had been entered in the second information, upon which the case was set down for trial, it was error for the court to set aside its order overruling the demurrer, which had been filed to the information, and to allow counsel for

the people to confess the demurrer and to file a new information; secondly, after the order overruling the demurrer had been set aside, and the demurrer was confessed, the court erred in not rendering or entering judgment upon the demurrer; and, thirdly, that the court erred in overruling the demurrer to the third information.

1. The court had jurisdiction to set aside the order, and to allow counsel to confess the demurrer and to direct the filing of a new information: Code Civ. Proc., sec. 128; Pen. Code, sec. 1008.

2. When the order was set aside, it would have been more formal to have entered an order allowing the demurrer: Pen. Code, sec. 1007. But the order entered, allowing the confession of the demurrer, and directing a new information to be filed, was the equivalent of an order allowing the demurrer. In legal effect the confession involved and decided the validity of the information, and left the defendant in the position of a person accused of crime, against whom no valid information had yet been filed. The proceedings, therefore, by which the information filed against him was invalidated, did not affect any substantial right of the defendant; and there was no prejudicial error in invalidating it and in directing another to be filed.

3. The information upon which the defendant was tried and convicted substantially complied with the requirements of sections 950, 951, Penal Code, and the court did not err in overruling the demurrer to it.

Next it is contended that the court erred in refusing to instruct the jury upon the subject of involuntary manslaughter. There was no refusal to instruct upon the subject of manslaughter. On the contrary, the presiding judge gave the definition of voluntary and involuntary manslaughter contained in the Penal Code, and defendant's counsel asked for no additional instruction upon the subject. But the court, in connection with its charge, told the jury that the law of involuntary manslaughter was inapplicable to the case before them, and this is complained of as error.

The case, as made out by the evidence contained in the record, was this: On the afternoon of July 30, 1882, Alexander, the deceased, and Biggins, the defendant, were drinking liquor, playing cards, and singing songs in the bar-room

of the Berenda Hotel in Fresno county. They continued at
that until about 5 o'clock in the evening. At that hour
"Alexander was very drunk—so drunk he could just keep
from falling." Defendant had only drank about half a dozen
glasses of beer. In that condition of the two men the pro-
prietor of the hotel left them alone in the bar-room while
he went to the railroad station, about eighty yards from the
hotel, to put the Berenda mail-bag on board the train, which
had just arrived at the station. After he left the bar-room
for that purpose the two men came out on the front porch
of the hotel, Alexander standing about five or six feet from
the door. · Suddenly he was seen to fall backward inside the
door of the bar-room, his feet sticking up outside the door.
In that position the defendant as suddenly jumped with both
feet upon the upturned face of the fallen man, completely
mashing it. "His nose. was mashed flat, his eyes were mashed
out, and the jaws were mashed down; his blood oozed on the
floor and was spattered on the walls." A witness of the act
shouted at the defendant, who immediately ran to the railroad
station, where he tried to board the train; but before he suc-
ceeded in his purpose he was arrested. Alexander was imme-
diately lifted up and carried into the bar-room, where, on
being laid down upon a mattress, he died.

As to these facts there was no conflict of evidence. The
record contains no other testimony given for the defendant
than his own. As a witness in his own behalf he testified that
he struck Alexander a blow with his right fist, which knocked
him through the door of the bar-room, down upon the floor;
that in giving the blow he fell with Alexander, striking his
own head so violently against the floor that he remembered
nothing afterward until he was arrested; that he knocked
Alexander down because he had followed him out onto the
porch, where, having grabbed him by the left shoulder, he,
Alexander, struck him on the right shoulder and one of his
arms, wounding him with a knife having a blade three inches
long on which he saw blood. But it was proved that Alex-
ander was left-handed; that he was not in the habit of carry-
ing any weapons whatever; and that no knife was found near
or on his person when he was taken up and carried into the
bar-room where he died, but the next day a closed pocket-
knife was taken from one of his pockets. It was also proved

that, some years before, there had been an old grudge between Alexander and the defendant, in which the latter had threatened to get even some day.

According to the testimony of the defendant himself, the case was not one of involuntary manslaughter. Assuming his testimony to be true, that he knocked down a drunken man for assaulting him, yet the facts remained uncontroverted that he did, after knocking him down, and while he lay prone and helpless, jump with both feet on his face, and that death ensued from the act. Such an act ·is felonious: Pen. Code, secs. 203, 204, 245. In no condition of society, civilized or uncivilized, can it be considered lawful to stamp out the life of a man under such circumstances. The act was therefore unlawful and felonious. Being such, there was in it none of the elements of involuntary manslaughter, and the charge of the court to that effect was correct: People v. King, 27 Cal. 507.

Where death ensues from an act committed under circumstances showing no considerable provocation to have existed, or an abandoned and malignant heart, or that the defendant did not intend the fatal blow to produce death, yet intended the blow, it is murder in the second degree: People v. Foren, 25 Cal. 361.

The act, in connection with the circumstances in which it was committed, made the defendant guilty of either murder of the first or second degree, or of voluntary manslaughter, or he was guiltless of any crime; and the questions arising out of the case for the determination of the jury were whether the act which resulted in the death of Alexander was the result of malice or passion, or of a necessity, real or apparent, which justified it, or whether it was committed by the defendant while unconscious of what he was doing. Upon all these questions—murder of both degrees, voluntary manslaughter, justifiable and excusable homicide, and irresponsibility in law for acts committed in mental unconsciousness—the court explained the law to the jury by instructions, given at the request of the people and the defendant, which, in their combination and entirety, were correct. Upon some of them, criticisms of more or less force have been made. But, so far as appears from the record, most, if not all, of the challenged instructions were given on the part of defendant himself;

and it is a well-settled rule that a party will not be heard to complain of instructions given at his own instance.

The main assignment of error, however, is that the court, in its charge, assumed as facts the death of Alexander; that the means adopted by the defendant caused his death; and that the manner of his death was brutal. In assuming these things as facts, it is contended that the court trenched upon the province of the jury. The alleged assumption that the manner of Alexander's death was brutal is predicated on the following instructions to the jury:

"The means adopted by the defendant which caused the death of deceased may properly be looked to in ascertaining whether the killing was malicious. If a deadly weapon was used, or means calculated to produce death, or the killing was done in a brutal and inhuman manner, and the killing not done in self-defense, or in sudden heat of passion, the jury will be at liberty to find that the slayer was actuated by malice, and the killing will be murder."

" . . . . If the jury believe from the evidence that the defendant, without receiving any. considerable provocation, resented acts or words of the deceased in a brutal manner, indicating malice and an abandoned heart, defendant is guilty of murder."

Both instructions were predicated upon a supposed state of facts which the evidence tended to prove. Whether they were proved was a question of fact; and whether, if found, they established malice ·in the act committed by the defendant, was one of the questions which they had to decide. The instructions were therefore properly given to aid the jury in coming to a correct conclusion upon the question whether the killing was malicious.

As to the assumption that Alexander was killed, and that his death ensued from the act of the defendant, neither of these things were denied. Neither his death, nor the means causative of his death, nor the time and manner of his death, were called in question; they were therefore uncontroverted facts. Such facts may be assumed as the basis of an explanation of the law regarding them.

Instructions to a jury should be given with reference to the imminent facts in a case. These may be either controverted or uncontroverted. Whether one or the other, they consti-

tute the basis of instructions. If controverted, instructions upon them should be hypothetical, leaving the supposed facts which the evidence tends to prove to the consideration of the jury. If uncontroverted, the court may assume them; for when the evidence to a fact is positive, and not disputed or questioned, it is to be taken as an established fact, and the charge of the court should proceed on that basis. It is only where there may be doubt, that the jury are required to weigh the evidence, and it is then only that the rule applies that the court shall not charge the jury upon the weight of evidence: Wintz v. Morrison, 17 Tex. 372–387; Hughes v. Monty, 24 Iowa, 499; Harrison v. Roy, 39 Miss. 397.

There was no error in the ninth instruction.

Considered and construed as a whole, the charge stated the law of the case correctly, and the case was presented fairly to the jury. We find no portion of it calculated to mislead the jury to an erroneous conclusion; and, that being the case, their verdict should not be disturbed, even although some part of the charge, standing alone, may contain some inaccuracy of expression which would be the subject of criticism: Phillips v. Ocmulgee Mills, 55 Ga. 633; W. & W. R. Co. v. Ingraham, 77 Ill. 309.

Judgment and order affirmed.

I concur in the judgment: Ross, J.

McKINSTRY, J.—I concur in the judgment. The court below correctly charged that the law of involuntary manslaughter was inapplicable to the case. The defendant was entitled to an instruction based upon the hypothesis that his testimony was true. But if his testimony was true, his act in striking the deceased—who held in his hand a bloody knife, three inches long, with which he had stabbed defendant at least twice—was not unlawful, but was an act of necessary self-defense. Involuntary manslaughter is the unlawful killing of a human being without malice, in the commission of an unlawful act, not amounting to a felony, or in the commission of a lawful act, which might produce death, in an unlawful manner, or without due caution or circumspection: Pen. Code, 192. Conceding the facts to be as stated by defendant, and the death to have been the result of a blow with

his fist, the killing was justifiable. It was done in resisting an attempt to murder or to do great bodily injury: Id. 197. It follows the court properly told the jury the law of involuntary manslaughter was not applicable to any phase of the evidence.

The court charged: "Insulting words, gestures, or actions will not reduce an unlawful killing from murder to manslaughter, unless the gestures or actions are such as to reasonably induce the belief of danger to life, or of great bodily harm, in the mind of the party against whom they are used."

This was plainly error. But inasmuch as the testimony of defendant (the only witness examined on his behalf) tended to prove, and, if credible, did prove, the killing to have been done in necessary self-defense, while the evidence on the part of the prosecution tended to prove a murder, an erroneous charge with respect to manslaughter could not have prejudiced the defendant. The killing by defendant being proved, the only other issue made by the evidence for or against him, and which the jury had to determine, was: Was the killing murderous or justifiable? Under these circumstances a verdict, guilty of manslaughter, could not have been a proper verdict, and defendant cannot complain of an instruction which may have induced the jury not to find such verdict. The court properly instructed them as to the law of self-defense.